IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PENNSYLVANIA and AMERICAN HOME ASSURANCE COMPANY,<br><br>Plaintiffs,<br>vs.<br><br>ELECTRIC TRANSIT INCORPORATED, SKODA, a.s., SKODA OSTROV, s.r.o., AAI CORPORATION and CZECH EXPORT BANK,<br>Defendants. / | No. C 04-3435 JSW (MEJ)<br><br>**ORDER DENYING AAI's MOTION FOR PROTECTIVE ORDER** |
| AAI CORPORATION,<br><br>Counterclaim Plaintiff,<br>vs.<br><br>NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PENNSYLVANIA, AMERICAN HOME ASSURANCE COMPANY,<br><br>Counterclaim Defendants. / | |
| AAI CORPORATION,<br><br>Third-Party Plaintiff,<br>vs.<br><br>AMERICAN INTERNATIONAL GROUP, INC.,<br><br>Third-Party Defendant / | |

## I. INTRODUCTION

Before the Court is the parties' April 5, 2006, joint letter to resolve a dispute regarding discovery costs incurred by Counterclaim Plaintiff/Third-Party Plaintiff AAI Corporation ("AAI") in response to Third-Party Defendant American International Group's ("AIG") request for electronic discovery. AAI requests that the Court shift one-half of the disputed costs to AIG pursuant to Federal Rule of Civil Procedure Rule 26(c)). AIG opposes the motion for cost-shifting. After consideration of the parties' papers, the applicable statutory and case law authorities, the Court hereby DENIES AAI's request.

## II. BACKGROUND

In 1997, the City and County of San Francisco awarded Electronic Transit Incorporated ("ETI") with a procurement contract to provide electric trolley buses for the San Francisco Municipal Railway System ("MUNI"). *Complaint for Declaratory Relief ("Complaint")* ¶ 12. ETI is owned by AAI and Skoda a.s., each holding a 35% and 65% ownership interest, respectively. *Id.* ¶ 11. While the parties agree the value of the MUNI contract awarded to ETI was $168,752,888, the parties disagree on the number of electric trolley buses (250 or 273) required under the MUNI contract. *Compare Complaint* ¶ 12 *and Answer, Counterclaims and Third-Party Complaint ("Answer")* ¶ 12.

Under the MUNI contract, ETI was required to obtain a labor and materials bond guaranteeing payment to its subcontractors and suppliers. *Answer* ¶ 111. In compliance with the MUNI contract, ETI obtained a labor and materials bond for $42,192,807 (later increased to $46,892,807) underwritten by two of AIG's member companies, National Union Fire Insurance Company of Pittsburgh, Pennsylvania and American Home Assurance Company (AIG, American Home Assurance Company and National Union Fire Insurance Company of Pittsburgh, Pennsylvania are collectively referred to as "AIG"). *Complaint* para. 1 at 2; *Answer* ¶¶ 110-112.

As a condition precedent to the issuance of a labor and materials bond, AIG required ETI, Skoda a.s. and AAI to execute an Agreement of Indemnity for any losses to AIG in connection with the bond issuance. *Complaint* ¶ 13; *Answer* ¶ 116. The Agreement of Indemnity allocated liability

2

1  for bond losses in proportion to the ownership interest held in ETI as follows: 1) ETI 100%, 2) AAI
2  35%, and 3) Skoda a.s. 65%. *Complaint* ¶ 13.
3        On December 24, 1997, ETI subcontracted with AAI in the amount of $53,133,500 for
4  portions of the MUNI contract. *Id.* ¶ 15. Pursuant to the ETI-AAI subcontract, AAI was
5  responsible for manufacture, assembly and configuration of the trolley buses following the initial
6  production and shipment of buses by Skoda. *Answer* ¶ 107. In turn, Skoda subsidiaries, Skoda
7  Ostrov and Skoda Energo (collectively "Skoda"), were responsible for the initial manufacture of the
8  electric trolley buses. *Id.* After Skoda completed the initial manufacture, the electric trolley buses
9  were then transported to AAI's facilities for further manufacture. *Id.* In the course of performing the
10 MUNI contract, AAI allegedly suffered substantial financial losses due to Skoda's delayed shipment
11 of the electric trolley buses to AAI. *Id.* ¶ 155.
12       In November 2003, AAI demanded payment from AIG under the labor and materials bond
13 for monies owed and unpaid by ETI. *Id.* ¶ 177. AAI alleged that AIG owed $58.2 million for labor
14 and materials provided by AAI as a subcontractor to ETI in connection with the MUNI contract. *Id.*
15 ¶¶ 63, 190.
16       In August 2004, National Union and American Home filed a Complaint for Declaratory
17 Relief against ETI, AAI, Skoda a.s., Skoda Ostrov, s.r.o. and Czech Export Bank. *Complaint.* AIG
18 sought judicial determinations that AAI was a principal of ETI as a joint venturer in the MUNI
19 contract and/or an alter ego of ETI. *Complaint* at para. 1, at 9. AIG also argued that AAI, a principal
20 of ETI, was jointly and severally liable for ETI's obligations under the labor and materials bond. *Id.*
21 ¶ 22. AIG further argued that AAI was an improper bond claimant with no standing or right to assert
22 a bond claim. *Id.* ¶¶ 17, 22, 25.
23       In November 2004, AAI brought a counterclaim suit and third party complaint for breach of
24 contract against AIG as Counterclaim Defendants and AIG as a Third-Party Defendant. *Answer* ¶¶
25 63, 71-73. In opposition to AIG's allegations, AAI claimed it was an eligible bond claimant and was
26 not a joint venturer and/or alter ego with ETI. *Id.* ¶ 67. AAI further argued that it was not obligated
27 to indemnify AIG because the Agreement of Indemnity was fraudulently induced. *Id.* ¶ 44.
28

The present discovery dispute involves only the Third-Party Plaintiff, AAI and Third Party-Defendant, AIG. *See Joint Letter (Request for Protective Order) of 4/5/06.* On July 21, 2005, November 10, 2005, and January 18, 2006, AAI and AIG met and conferred pursuant to this Court's standing order governing discovery disputes. *Id.* at 1. Failing to resolve the discovery dispute, AAI and AIG submitted a joint letter to this Court on April 5, 2006. *Id.*

### III. DISCUSSION

**A. Legal Standard**

Federal Rule of Civil Procedure Rule 26(b)(1) permits discovery of any unprivileged matter that is relevant to a claim or defense of any party in the pending action. Fed. R. Civ. P. 26(b)(1). However, Rule 26(b)(2)(iii) constrains discovery permitted by Rule 26(b)(1) when the discovery request imposes a burden or expense that is outweighed by its potential benefit, "taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues." Fed. R. Civ. P. 26(b)(2).

In addition to the limitations imposed by Rule 26(b)(2), discoverable matter may also be subject to a protective order pursuant to Rule 26(c)). Fed. R. Civ. P. 26(c)). Under Rule 26(c)), a district court may grant a protective order upon a motion accompanied by a certification that the parties have attempted in good faith to resolve the dispute and shown good cause. *Id.* Specifically, a district court may protect a party from undue burden or expense by ordering the discovering party to pay production costs as a condition precedent of receiving discovery. *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 358 (1978). In so doing, a district court subverts the presumption that the responding party bears the costs of production and protects the moving party from undue burden or expense. *See Id.* Thus, Rule 26(c)) protective orders allow courts to reconcile the permissive nature

4

of Rule 26(b)(1) with the cost-sensitive focus of Rule 26(b)(2). *Zubulake v. UBS Warburg,* 217 F.R.D. 309, 316 (S.D.N.Y. 2003) ("Zubulake I").

Cost-shifting, however, is not an appropriate solution in every case and "should be considered only when electronic discovery imposes an 'undue burden or expense' on the responding party." *Zubulake I,* 217 F.R.D. 309, 317-318 (S.D.N.Y. 2003) (citing Fed. R. Civ. P. 26(c)).

A finding of "undue burden" as it applies to electronic discovery "turns primarily on whether it is kept in an accessible or inaccessible format (a distinction that corresponds closely to the expense of production)." *OpenTV v. Liberate Technologies,* 219 F.R.D. 474, 476 (N.D. Cal. 2003) (James, Mag.J.) (citing *Zubulake I,* 217 F.R.D. at 318). In turn, "[w]hether electronic data is accessible or inaccessible turns largely on the media on which it is stored." *Zubulake I,* 217 F.R.D. at 318. Thus, cost-shifting "should be considered only when inaccessible data is sought." *OpenTV,* 219 F.R.D. at 476 (citing *Zubulake v. UBS Warburg,* 216 F.R.D. 280, 284 (S.D.N.Y. 2003)) ("Zubulake II").

After resolving the threshold matter of whether cost-shifting may be considered at all, the next step is to consider the appropriateness of cost-shifting where inaccessible discovery is requested. *OpenTV,* 219 F.R.D. at 477 (citing *Zubulake I,* 217 F.R.D. at 321); *See infra* Part III.B.

**B. Legal Analysis**

The discovery dispute before this Court is unique in that AAI requested a protective order after the document production. *See Joint Letter (Request for Protective Order) of 4/5/06,* at 3-4. The first time this Court learned of AAI's request for cost-sharing was when the parties submitted a joint letter on March 2, 2006, three months after the disputed costs were incurred. *See Joint Letter (Request for Protective Order) of 3/2/06,* at 1. AAI reported in the March 2, 2006, joint letter that it

spent over $413,562 as of December 2, 2005. *Id.* at 2. AAI further stated that it did not present AIG with a detailed accounting of the charges until February 15, 2006. *Id.* Generally, a court's ability to monitor costs is limited to the window of time before or during the document production when costs are within the Court's control. Specifically, this Court was not able to issue an order that required cost-shifting as a condition of the receipt of discovery; to ask the parties to conduct data sampling in advance of production (thereby informing the cost-shifting analysis with a factual basis); to compare the likelihood of discovering relevant information versus the burden or expense imposed; or, to suggest less cost-prohibitive alternatives. Notwithstanding the motion for protective order was untimely, the Court will nonetheless analyze whether cost-shifting is warranted.

The first consideration is whether the disputed discovery is the proper subject matter of a cost-shifting analysis. The *Zubulake I* court re-emphasized that shifting discovery costs is appropriate only where a responding party's compliance with an electronic discovery request results in "undue burden or expense." *Zubulake I*, 217 F.R.D. at 318. This question of whether electronic discovery is "unduly burdensome or expensive" is largely a matter of the accessibility or inaccessibility of the electronic repository. *OpenTV,* 219 F.R.D. at 477 (citing *Zubulake I*, 217 F.R.D. at 318). Thus, the definition of "undue burden or expense" is based on an inaccessible/accessible distinction, a cost-driven definition that " . . . turns largely on the expense of production." *Id.* In turn, the accessibility of electronic data depends on the media used. *Zubulake I,* 217 F.R.D. at 318.

In the present case, the discovery request concerns e-mail (and other electronic documents) residing on AAI's backup tapes. Restoring electronic data from backup tapes is time-intensive because backup tapes capture electronic data into a format that is machine-readable rather than

6

human-readable. *Zubulake I,* 217 F.R.D. at 319. As a result, individual documents and files cannot be produced from backup tapes without an expensive, multi-step process that includes data decompression and restoration. *Id.* Here, the disputed discovery is the proper subject of a cost-shifting inquiry because the requested documents cannot be produced without an expensive, time-consuming process, thereby imposing a potentially undue burden or expense on the responding party.

Having placed the present dispute within the province of cost-shifting by virtue of the inaccessible media type, the next step is the cost-shifting analysis as articulated by *Zubulake I* and applied by this Court in *OpenTV*. The following factors are used to determine whether cost-shifting is appropriate.

1. The extent to which the request is specifically tailored to discovery relevant information;
2. The availability of such information from other sources;
3. The total cost of production, compared to the amount in controversy;
4. The total cost of production, compared to the resources available to each party;
5. The relative ability of each party to control costs and its incentive to do so;
6. The importance of the issues at stake in the litigation; and
7. The relative benefits to the parties of obtaining the information.

*OpenTV,* 219 F.R.D. at 477 (citing *Zubulake I*, 217 F.R.D. at 321).

The first two factors are the most heavily weighted factors and incorporate the "marginal utility" principle employed in *Steven McPeek v. John D. Ashcroft* 202 F.R.D. 31 (D.D.C. 2001). The *Steven* court stated:

> The more likely it is that the backup tape contains information that is relevant to a claim or defense, the fairer it is that [the responding party] search at its own expense. The less likely it is, the more unjust it would be to make the [responding party] search at its own expense.

202 F.R.D. 31, 34 (D.D.C. 2001).

The first factor is a relevance driven inquiry that assesses the "specific tailoring" of a discovery request to a claim or defense. *See OpenTV*, 219 F.R.D. at 477-478. AIG asserts that its

7

discovery request was specifically tailored to AAI's claims and allegations. *See Joint Letter (Request for Protective Order) of 4/5/06,* at 4. However, AIG's statement is conclusory. AIG failed to provide the Court with information substantiating its assertion such as the disputed discovery request, an e-mail retrieval protocol or a report from an information technology expert regarding data restoration techniques considered or employed. As a result, this Court analyzes this factor without the benefit of basic information such as the subject matter requested, the time period requested, the total number of backup tapes restored, the yield of responsive documents per backup tape restored and the cost per backup tape restored.

AAI failed to address the first factor altogether and failed to respond to AIG's conclusory statement. AAI, however, provided a few helpful data points. *See Joint Letter (Request for Protective Order) of 4/5/06,* at 1. AAI informed the court that it produced 350,000 electronic images from the archived backup tapes of forty custodians over a nine year period. *Id.* While AAI may have stated the total number of produced images, it failed to state the total number of backup tapes restored, making it impossible to calculate the yield of responsive documents per backup tape. The analysis is substantially hindered as to the first factor without additional facts.

The second factor favors cost-shifting when the requested discovery is available from alternative sources. *See OpenTV*, 219 F.R.D. at 478. Applying the marginal utility test to the instant case, if AIG's request was narrowly tailored (factor one) and if the requested e-mails were available only from the backup tapes (factor two), then the marginal utility of the backup tapes is potentially high. But without information from the parties as to the availability of the requested information from other sources, the Court cannot judge the marginal utility of the disputed backup tapes.

The better approach in the present case would have been to first sample data from a select number of backup tapes as a test run, a cost-conscious methodology deployed successfully in *McPeek* and *Zubulake II*. This is particularly true since the parties here, unlike the *OpenTV* parties, did not have an estimate of the burden or expense in advance of the production. As discussed previously, the Court in *OpenTV* received an estimate of the anticipated burden or expense (125 to 150 software engineer hours) in advance of the production. *OpenTV*, 219 F.R.D. at 477.

The third factor favors cost-shifting when the discovery costs are disproportionate to "the overall amount in controversy." *OpenTV*, 219 F.R.D. at 478 (citing *Zubulake II*, 216 F.R.D. at 288). Here, AAI claims that AIG's discovery request imposed an undue burden and expense. AAI estimates that its personnel spent 1000 hours to restore and verify the requested data. *See Joint Letter (Request for Protective Order) of 4/5/06*, at 1. In addition to the initial processing time expended by its staff, AAI further alleges it incurred $413,562.95 in fees from external software vendors hired to process the electronic data into a usable format. *Id.* at 2. AAI states that it produced "more than 350,000 electronic images . . . generated by 40 custodians over nine different year-end time slices." *Id.* at 1. AAI describes AIG's production of 15,000 images as "meager" in comparison. *Id.* In response, AIG states that the sheer volume of documents produced (350,000 images) does not by itself warrant cost-shifting because the large document production is a mere reflection of AAI's substantial participation in the underlying suit. *Id.* at 3. AIG further argues that many documents produced by AAI were non-responsive and duplicative. *Id.*

Notwithstanding the arguments put forth by AAI and AIG relating to AAI's document production, the time and money expended by AAI is meaningful only in relation to the amount in controversy because the third factor is a proportionality-driven inquiry. Here, AAI seeks over $150

9

million in combined construction costs, lost business opportunities and punitive damages. *See Joint Letter (Request for Protective Order) of 4/5/06,* at 4 (citing *Third Party Complaint* at 48-49). In comparison, the disputed discovery costs are $413,562. Consequently, the cost of production compared to the amount in controversy is *de minimis* at .3%. *See Joint Letter (Request for Protective Order) of 4/5/06,* at 4.

The fourth factor considers the total cost of production in comparison to the resources available to each party. *Zubulake I,* 217 F.R.D. at 322. Here, the litigants are prominent corporations in the defense contracting and insurance industries. *Answer* ¶¶ 76, 100. AAI's parent company reported annual sales near $300 million while AIG and its subsidiaries reported annual revenue $81.3 billion in 2003. *Id.* This is not a case between a single plaintiff and a multinational corporation as in *Zubulake. Zubulake II,* 216 F.R.D. at 288. Although the *Zubulake* plaintiff was a highly paid equities trader, the annual earnings of this single plaintiff were no match for the billion dollar net profits of a global investment firm. *Id.* Instead, the litigants in the present dispute resemble the two corporate entities in *OpenTV* that this Court judged to be "similarly situated" in their ability to pay the disputed electronic discovery costs. *OpenTV,* 219 F.R.D. at 478. Consequently, the parties each possess considerable financial and human resources with which to pay the disputed fees.

The fifth factor weighs the relative abilities of each party to control costs and the corresponding incentives to do so. *Zubulake I,* 217 F.R.D. at 322. This Court agrees with AIG's assertion that AAI had exclusive control over costs, particularly in light of the untimeliness of the motion for relief. *See Joint Letter (Request for Protective Order) of 4/5/06,* at 3. By its own admission, AAI selected the software vendors. *Id.* at 1. Once vendors are selected, costs are outside

the control of both parties. *Zubulake II*, 216 F.R.D. at 288. The software vendors selected by AAI then submitted invoices for $413,562. *See Joint Letter (Request for Protective Order) of 4/5/06,* at 1. Consequently, AIG was not afforded the opportunity to provide input during the vendor selection process or to search for a less expensive vendor.

This Court also finds that AIG is correct in asserting that AAI was best able to control costs as the "the keeper" of the requested data. *Id.* at 4. The facts in the present case are analogous to *OpenTV*. In *OpenTV,* the disputed electronic data was source code residing on the responding party's software database. Here, the electronic discovery resides on the responding party's backup tapes. While backup tapes are not identical to a software database, this is a distinction without significance. Consequently, AAI knows best how to retrieve the requested data from its archived backup tapes.

The sixth factor is rarely implicated. *Zubulake I,* 217 F.R.D. at 323. This factor considers whether there are novel issues presented by the litigation. *Zubulake II*, 216 F.R.D. at 289. Here, the parties are litigating an insurance contract with underlying corporate governance and status issues. While the Court is mindful of the parties' interest in litigating the disputed insurance contract, this case does not appear to present novel issues. Thus, this factor is not implicated.

The seventh and last factor weighs the relative benefits to the parties of obtaining the requested information. This is the least important factor because it is presumed that the requested discovery generally benefits the discovering party. *Zubulake I,* 217 F.R.D. at 323. Consistent with the presumption that the requesting party derives the greater benefit, this Court in *OpenTV* rejected the requesting party's argument that the disputed discovery would deliver equal benefits to both parties as it could be used to support either infringement or non-infringement claims. *OpenTV*, 219 F.R.D. at 479.

11

Here, AAI argues that AIG will derive a greater benefit as the requesting party and asks the Court to weigh this factor in favor of cost-shifting based on principles of fundamental fairness. *See Joint Letter (Request for Protective Order) of 4/5/06,* at 2. In response to AAI's argument, AIG claims that AAI will derive an equal benefit as the party that bears the burden of proof. *Id.* at 4. Applying the rationale used in *OpenTV*, this Court finds that AIG will derive a far greater benefit from the requested data than AAI. While it may be true that AAI may derive some benefit from the requested discovery, AIG will benefit to a far greater degree because AIG's defenses revolve around the alleged relationship between AAI and ETI.

Balancing all seven factors suggests that cost-shifting is unwarranted. The greatest weight is placed on factors one and two. As to the first two factors, the Court cannot judge the degree to which the disputed discovery request was "specifically tailored" without the instant request nor the availability from alternative sources based on the information provided. The cost of production relative to the amount in controversy is *de minimis*. Both parties are corporations similarly situated to bear production costs. Costs were not controllable given the untimeliness of AAI's motion. This case presents no novel issues. Finally, AIG will derive the greater benefit as the requesting party. On balance, the Court finds cost-shifting is unwarranted.

## CONCLUSION

For the foregoing reasons, the Court hereby DENIES AAI's Motion for Protective Order pursuant to Federal Rule of Civil Procedure 26(c) WITHOUT PREJUDICE. AAI may refile the motion upon showing of good cause as to the untimeliness of the Motion.

**IT IS SO ORDERED.**

Dated: 6/1/06

MARIA-ELENA JAMES
United States Magistrate Judge

13